The first case for argument this morning is 17-1715 Luitpold Pharmaceuticals, Mr. Quillen. Is that the way you pronounce your name? Quillen, Your Honor. May it please the Court, I'd like to address three issues. Claim construction, violation of the Administrative Procedure Act, and the Board's wrong standard for a motion to amend. There's also the issue of the lack of standing for the Pharmacosmos cross-appeal. For issues that I don't address this morning, we rely on our briefs. On claim construction, for both patents, the Board erred in construing the term substantially non-immunogenic carbohydrate component in two ways. Version of the yellow brief of 10, speaking of claim construction, you cite to the 549 patent, column 2, line 7 to 10, where it says the risk of anaphylactoid hypersensitivity reactions is very low compared to iron dextrin. And that portion relates to a particular iron carboxymaltose complex, which is described as preferred iron carbohydrate complex. Now, we've repeatedly warned against confining claims to a preferred embodiment, Philips, for example. Why isn't that an improper attempt to limit the broadest reasonable interpretation? The Board has correctly focused on anaphylactoid hypersensitivity reactions and has properly referred to the complex of iron dextrin. But the limit... Why adverse reactions to iron dextrin rather than merely dextrin? Because that's the complex, Your Honor. That's the complex. Okay. What other language in the specification compares the incidence of adverse reactions to iron dextrin rather than merely dextrin? I don't think, Your Honor, that there's any place in the spec that evaluates dextrin alone. Why isn't iron improperly limiting broadest reasonable interpretation? I'm sorry, Your Honor? Why aren't you improperly limiting the BRI to a particular embodiment? It's not a particular embodiment, Your Honor. We've got the claim recites these components, these features in the Marcuse group. The Board has properly addressed anaphylactoid hypersensitivity and the comparison is to iron dextrin. Column one, we're talking about that the invention broadly relates to treating conditions with the complexes. In column... sorry, line 47, iron dextrin, so that's what's being compared, the iron dextrin, the first parental product that's available in the U.S. has been associated with these anaphylactoid-type reactions, citing fish pain, and this high incidence is bad, da-da-da, and it's markedly lower with other kind of products. Did the PTAB make a finding that fish pain is incorporated by reference, or are we supposed to make that a factual determination in the first instance? Respectfully, it's not a factual situation, Your Honor. The patent expressly says that. Okay. So you argue it should be treated as intrinsic evidence. Exactly. Column 17, line 50, these references are incorporated by reference. So the fish pain is set out, as it were, although the text of fish pain, as it were, is set out there in lines 47 to 59. Okay, so fish pain says, quote, the risk of immediate severe anaphylactoid reactions appears to be at a minimum approximately 0.6% with intravenous iron dextrin. We're not putting in intravenous. The reference goes on to recognize even higher rates of 1.8 and 1.7% showing up in patient populations, right? Given the at a minimum language and the higher incidence rates disclosed, how does fish pain itself support your argument that the incidence rate should be lower than 0.6%? Let me answer that in two ways, Your Honor. First, whatever the risk is, whatever the risk, it's a number, and the board declined to give us a number. Whatever the risk is, it's a numerical value. It's a number. What should that number be? It ought to be 0.6%. Fish pain is talking about a large population. Fish pain's got lots of people. The other features there in fish pain have to do with particular populations. If we're talking about just here, the broadest reasonable construction ought to be 0.6%. Yeah, you're... Why not the other numbers? You're saying the broadest ought to be, but they cite to as high as 1.8. I can say, Your Honor, that those have to do with other populations, not the whole population. If you look at what fish pain is doing broadly, fish pain is talking about a big population, 0.6%. Other studies also have a similar number, 0.6% or 0.7%. As you point out, Fish Pain reports a Woodman study, which has got 1.8%, and 1.7% in some other patients over a two-year period. If you're trying to show that it's lower than iron dextran, you're trying to evaluate one thing compared to something else, then if iron dextran produces it in 0.6%, folks, if you're higher than that, then you're not lower than iron dextran. Your Honor. On what maybe is a threshold question, why isn't it at least reasonable for the Board to look at the carbohydrate component, given the language of the claim, which associates the risk with the risk of dextran, not iron dextran? Dextran is just the carbohydrate, so the iron dextran is the complex. In our view, there's nothing in the spec that points to the carbohydrate itself as the thing that ought to be compared to. Well, you might get a little bit of that out of, what is it, the Column 1 reference to the dextran moiety? It's not perfectly clear, I think, but we are dealing with a broadest reasonable interpretation standard, so perfect clarity is probably not quite the right. So where Column 1, Line 52, this high incidence of anaphylactoid reactions is believed to be caused by the formation of antibodies to the dextran moiety. Not sitting alone, Your Honor. The dextran moiety as complex as part of the whole thing, as part of the product. Which goes on, the very next line of that column, says the incidence of anaphylaxis with these products. Right, but I guess where I really started, the moiety may have been a detour, but where I was starting with was with the claim language, wherein a low risk is an incidence of adverse events lower than dextran. That sounds like the thing whose risk you're comparing is, in that instance, dextran, namely the carbohydrate, not the complex that includes the carbohydrate as a component. That's not the... You're talking about the claim language, Your Honor? Yes. Have I got the claim language wrong? That was the board's construction. Oh, the board's construction. I'm sorry. That's not the claim. I apologize. That's not the claim. So as we say, the construction is wrong. If I may, given my time, I'll go on to the APA violation. The board erred with regard to the 549 patent with regard to a different term, construing polyisomaltose for the first time in its final written decision. Because polyisomaltose was not construed in the institution decision, the board failed to inform Lewitt Gould that trial was being instituted on the ground that Roman supposedly disclosed the claimed polyisomaltose species of the Marcuse group. The board's subsequent determination in the final written decision thus amounted to a new ground of unpatentability, depriving Lewitt Gould of notice and an opportunity to respond. Lewitt Gould did not have a fair opportunity to react to the thrust of the board's eventual reliance on Groman. The pharmacosmos reply brief and the oral argument during the IPR don't cure the board's error in relying on the new ground in the final written decision. The petition, the pharmacosmos petition, offered two alternative constructions of iron polyisomaltose and a view of Groman as teaching iron polyisomaltose contingent on the board adopting one of those alternative claim constructions. That's the appendix of 174. The board chose not to construe the term. That's appendix 4970. Consequently, there's no notice to Lewitt Gould that the IPR was being instituted on the ground that Groman allegedly taught iron polyisomaltose. At the oral hearing, even the APJ who authored the institution decision was unaware that there was a ground based on Groman allegedly teaching an iron polyisomaltose. That's the appendix 5097 to 5098. There's no notice to him. There certainly wasn't any notice to us, Your Honor. And that decision should be reversed for that reason. We're into your rebuttal. I'll just mention the motion to amend. The board improperly imposed a duty on Lewitt Gould. You don't think the two footnotes... The two footnotes don't cure that, Your Honor. The footnotes, there's no notice. And footnotes, a footnote isn't enough. Heaven help us, the court's position is that counsel can't preserve arguments by a mere footnote. And especially for the 702 on the size of the particle, the board expressly put the burden on Lewitt Gould to come up with a claim construction and just talk about how a person of ordinary skill in the art would, whether he would regard less than about 9 nanometers as including something bigger than that, 10. That was all put on Lewitt Gould improperly. I'll save the rest of my time for rebuttal, Your Honor. Thank you. May it please the Court. Your Honors, I'd also like to start with the claim construction, the same issue that was discussed first this morning. Your Honors, in our view, the claim construction is supported by the clear language of the claim itself. It's supported by the clear language of the specification that was discussed this morning. And Lewitt Gould's attempt to change that language is based upon extrinsic evidence. And I'm happy to address each one in turn. The claim language itself, I think, is self-evident. The specification that was discussed this morning, starting... Talk about the claim language. Certainly, Your Honor. So the claim language itself has the term... Are we looking at independent claim 1 of 549? We are, Your Honor, yes. Thank you. And the claim language itself starts using, with the terminology, a substantially non-immunogenic carbohydrate component. It's very clear that the non-immunogenicity is tied to the component itself. The specification repeatedly refers to the component itself, starting right with the abstract on the cover of the patent, stable and non-immunogenic carbohydrate component. It continues with the passage that was discussed this morning in column 1. And the other passage that I wanted to identify without identifying them all is at column 10, lines 58 to column 11, line 2, where the patent discusses the iron-carbohydrate complexes for use in the methods of the patent. It specifically says that they have characteristics including a non-immunogenic carbohydrate component. So to us, it's very clear that the patent specification is consistently using... Is there anything in the specification that provides measurements of the immunogenicity of the component alone, not of a complex with a particular carbohydrate in it? No, Your Honor, there is not. The embodiment with PIT45 does have data with respect to the overall product. That is true. There's nothing that we see that specifically is directed to the component itself. But the teaching of the patent is very clear that the concern is with respect to reactions to the component based upon prior experience with old-school dextran products. And that's why the patent repeatedly talks about having dextran antibodies. And, you know, the issue there is that if the carbohydrate is immunogenic, odds are that the complex, including iron, will also be immunogenic. Let's turn to the motion to amend where your friend ended. PTAB can have the benefit of aqua products. In light of that, do you agree that the PTAB erred in improperly assigning the burden? Your Honor, the law certainly changed during these proceedings. We all recognize that. I think the petitioner and the board thankfully recognized that that was a possibility and made care to make sure that the burden, if the burden changed, which it did, that that was recognized. And the opinion, in our view, not only recognizes it with the two footnotes that were discussed earlier, but with detailed analysis as to why that burden was met. So we feel there's sufficient evidence in the opinions themselves that the burden was properly allocated and that the burden was properly met. But your friend also added pretty specifically the 702 patent and that the burden was placed on the patent owner with respect to, I think he said, claim construction and so forth. Do you have any response to that particular point that he made? So with respect to the 702 patent, your Honor, with respect to viewing the issue of claim construction, claim construction was, and I think that this goes to a couple of different issues, but claim construction didn't need to be espoused by the board. In our view, the board, with respect to the term polyisomaltose, did adopt and point to the alternative claim construction that was provided by Pharmacosmos. And as a matter of fact, you know, on this issue of notice, the board specifically cited to a claim chart that was included in the IPR petition which mapped the prior art reference Groman to an example in Groman, example 28, which specifically is for the embodiment of polyisomaltose. So the issue as far as it not being noticed to us as a red herring, the board did what it needed to do. It specifically cited to the alternative construction. It specifically cited to the claim chart having the reading for that construction in its institution opinion that there should be no failure of notice on that point, your Honor. Your Honor, I wanted to turn back to Fishbane where there was some questions earlier. In our view, Fishbane is not incorporated by reference, notwithstanding what counsel said. And as a matter of fact, counsel for Louis pulled during the IPR oral argument, admitted that it's not incorporated by reference. Where's that? That is in the oral argument transcript, your Honor. And we'll get you the site right away. Actually, I'm sorry. It's also cited in the final opinion on page 11 for the 702 patent. Your Honor, the question for us is it is a question of law with respect to incorporation by reference. And we cited the advanced display case which states that, you know, incorporation by reference is a question of law. It requires details regarding which portion of the reference is being cited for what proposition. And that's not the case here. Here, there's no details in the specification, only the full site. There's no discussion as far as why it's being cited for this .6 as opposed to some other relevant number that your Honor asked about earlier today. But even if you find, as a matter of law, that it's incorporated by reference, that doesn't help Louis Bolt. It doesn't help them for two reasons. One, as the Court has recognized, Fishbane does disclose other numbers. The argument that .6 percent is associated with the population at large we think is simply incorrect. The reference says that .6 is associated with 481 hermio dialysis patients, not the population at large. Second, if Fishbane is incorporated by reference in the CEG Fishbane, another reference is likewise listed in that same passage. And that's the Landry reference that the PTAB also recognized. And that reference discloses rates of 4.7 to 43 percent. So the numbers are all over the place. There's no reason to pick and choose .6 percent. Your Honors, I could turn, unless there are any questions. The appendix site, Your Honor, is appendix 5068. Thank you. I'd like to turn to the polyisomaltose question. And we discussed notice earlier. With respect to the issues as far as whether or not, whether or not the claim construction 5068. 5068, Your Honor, yes. With respect to the issue of notice, I also wanted to add that the alternative claim construction proposed by Pharmacosmos, and which was cited too by the board, is also consistent with Louis-Bowles. You should be aware that at least my version of the joint appendix doesn't in fact have 5068 in it. It's a very common thing. You put numbers on everything, but you only bind the stuff that you cite. So we don't have that. Our apologies, Your Honor. No. Judge Toronto was being kind. I wasn't. The claim construction is also consistent with Louis-Bowles' own claim construction that was used during prosecution of these patents. And so the issue of notice is one, again, it's one of a red herring.  Is this the point that Mr. Quillen was mentioning when he said that one of the administrative patent judges expressed some surprise about this? Or is that a different point? So it's the same issue, Your Honor. But the point of the claim construction being used by Louis-Bowles during its own prosecution was not raised, and I wanted to raise that. But I'm happy to address the ALJ's discussion that was discussed earlier. P.J.'s. P.J.'s. Apologies, Your Honor. So in that context, Your Honor, yes, there was a question and answer between counsel and the judge. And perhaps there was a misunderstanding by counsel, or perhaps the counsel was answering a question while the question was being asked. But regardless, the record was clarified after the exchange that was discussed by counsel earlier this morning to state that Grumman taught two different species. It taught with respect to dextran T1, which is being equated with polyisomaltose for ground 4. And it alternatively taught a different species, carboxymethyl reduced dextran. And that was made very clear on the record. So there were two different bases for citing to the reference, and those two different bases were put into the record and understood by the board. Your Honors, I will now turn, with your okay, to the cross appeal. And the cross appeal, in our view, is one that presents some novel issues for the court, quite candidly. Why is it? I wanted to answer the question of why it's a proper cross appeal, why it's properly before us. Yes, Your Honor. So we believe that the cross appeal is properly before this court because there is, in fact, injury in fact. And because the cross appeal would enlarge the scope of the judgment as required under the case law. In the August 2016 press release, it says you're still conducting testing in the United States that will take several years and are still searching for commercialization partners. Is that still the case? It is, Your Honor, yes. So why are you in a different position from the position of the losing party in Sandoz? Well, Your Honor, in the Sandoz decision, their, first of all, the DJ action, which It's all about case or controversy. We agree. As we understand that decision, there was no jurisdiction when the only activity was Here we have different facts. First of all, we are going through phase three clinical trials. But more importantly. Am I remembering right? I think I am. The would be generic was either at that stage or maybe even beyond that stage in Sandoz. That may be the case, Your Honor. To us, the main distinction, Your Honor, is the letter that we've cited to. And the fact that we pulled wrote a letter to both Pharma Cosmos and to its business partner, its potential business partner in the United States, asserting patent rights and threatening infringement. It is an act that we didn't see in the Sandoz case and we don't see in a lot of the other cases. There's an affirmative act by the patent owner to enforce patent rights against us that makes it a distinguishing factor. Now, it's not as clear cut as that because the patent rights asserted were not the 702 patent. I think we all recognize that. So we have a little bit of an additional hurdle to get through to convince the court that the assertion of. Just a little bit. That the assertion of other patent rights, which have substantially similar claim elements, including this 15 minutes or less claim element at issue, would create a reasonable apprehension on the part of Pharma Cosmos that it will be sued. And, Your Honors, I think it's important to recognize, and I know I'm running out of time rapidly, but every DJ plaintiff is in the position that they believe that their product does not infringe the patents. Otherwise, they wouldn't be in court under Rule 11. We, likewise, are in that position. And whether we pulled believes or doesn't believe that one of its patents are more or less relevant doesn't change the apprehension on the part of Pharma Cosmos. Your Honors, I'd like to reserve my remaining minute. Okay. Thank you. Just briefly, Your Honor, on the immunogenicity, that's attributed to the component only when it's present in the complex, never by itself. The comparison is made when the carbohydrate is attached to the iron. There's nowhere, there's nowhere, there's any reference to the spec administering the Even the art that's inside it shows the administration with iron, the iron dextran. In Column 12, this is Appendix 90, the iron carbohydrate complex, VIT-45, generally does not contain dextran and does not react with dextran antibodies. Therefore, the risk of anaphylaxis hypersensitivity reactions is very low compared to iron dextran. That's the comparison on those. Counsel has mentioned that, about what's in the spec, what's in the prosecution history, overlooking Appendix 31, 33, the Lawrence Declaration, Paragraph 7 of which compares monifer to the, compares it, recites this claim language and compares it to monifer, the complex, not a carbohydrate alone. On notice, it's the board that's required to provide notice to Lewitt-Pold. You can't, after the fact, say, oh, well, you should have been pressing, you should have figured out, you should have known what was in the board's mind based on what was in the petition. That's not appropriate. Why is it, if the petitioner includes in the petition an argument, why is more in the way of notice needed that the board might well rely on that argument? Or is that not the situation? Down the road, so what's happened here, there were two alternatives presented by the petitioner. There was a proper claim construction and what they called an alternative claim construction. If the board adopted this alternative, then these consequences flow. The board didn't adopt it. The reasonable view is, well, the consequence didn't flow. To allow the board to do what they're doing here is to say the board can not provide any notice to the patent owner and then down the road, down the road, open things up and say, oh, well, now here's a new thing. Here's a new rationale. Here's a new theory. So the board here said we determine at the institution stage that no explicit construction of any other claims necessary to determine whether to institute a trial in this case. So your view is that therefore they're foreclosed, notwithstanding any discussion and opportunity response that they're just foreclosed from doing any claim construction because they said that no explicit claim construction was necessary? So our view that they cannot later on then, in light of that, giving us the impression that that alternative argument about whether Roman disclosed a different species, the polyisomaltose species, that argument was off the table. That argument wasn't available. That argument wasn't being pressed. And so when trial was instituted, that wasn't an issue that we were faced with. If the board, and clearly the judge didn't realize that. The judge who wrote the opinion, he didn't realize that was what was going on until later on. If he didn't know what was going on, heaven help us, the patent owner certainly didn't know what was going on. And I'm out of my time, but finally on the motion on the cross-appeal, we are bereft of evidence. There's no evidence. It's their burden. They didn't carry it. And you just permitted him to be able to respond to you. So you do get your remaining minute. Thank you. On this issue of notice, we wanted to respond briefly. No, no, no. That's not your cross-appeal.  I'm sorry? You can't go beyond the cross-appeal. Apologies, Your Honor. On the issue of the cross-appeal, Your Honor, the evidence, I was looking at one issue for the purpose of another issue. The evidence with respect to the Modifer product that was just discussed, in our view, is likewise evidence of reasonable apprehension of suit. The fact that this product, Pharmacosmos' own product, was cited as an alleged embodiment of the patents that were asserted against both Pharmacosmos and its business partner to us is, again, another piece of concrete evidence showing that there is reasonable apprehension of suit. Thank you. Thank you, Your Honor. We thank both sides, and the case is submitted.